**UNITED STATES DEPARTMENT OF JUSTICE, IMMIGRATION AND NATURALIZATION SERVICE, BORDER PATROL, EL PASO, TEXAS, Petitioner Cross–Respondent,**

v.

**FEDERAL LABOR RELATIONS AUTHORITY, Respondent Cross–Petitioner.**

No. 91–4153.

United States Court of Appeals, Fifth Circuit.

March 19, 1992.

E. Roy Hawkens, William Kanter, Attys., Appellate Staff, Civil Div., Dept. of Justice, Washington, D.C., for petitioner cross-respondent.

James F. Blandford, Atty., William E. Persina Sol., F.L.R.A., William R. Tobey, Deputy, Arthur A. Horowitz, Associate Sol., Washington, D.C., for respondent cross-petitioner.

Judith D. Galat, Mard D. Roth, General Counsel, Am. Fed. of Gov't Emp., Washington, D.C., for intervenor Am. Fed. of Gov't Emp., N.B.P.C.

Barbara A. Atkin, Gregory O'Duden, N.T.E.U., Washington, D.C., for National Treasury Empl. Union.

Before GOLDBERG, JOLLY, and WIENER, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

The question in this case is whether uniformed border patrol agents have either the statutory or constitutional right to wear union lapel pins on their uniforms. The administrative law judge and the Federal Labor Relations Authority (FLRA) both held that the INS committed unfair labor practices when it required an agent to remove his pin and later gave him a lower appearance rating for wearing it.

On appeal, the FLRA and the amicus union argue that both the statute,

which protects the right to "assist labor organizations," and the First Amendment, which protects free speech, assure the right to wear union pins. On the other hand, the INS argues that its right to require a uniform, which has been sanctioned by the courts, includes the right to prohibit adornments to that uniform. The INS further argues that, since it is a law enforcement agency, its policy requiring unadorned uniforms is entitled to deference. We agree and hold that the border patrol agents do not have the right to wear union lapel pins while on duty, and, consequently, that the INS did not commit any unfair labor practices by interfering with that right. We also hold that the INS's antiadornment policy does not violate the border patrol agents' First Amendment rights. Therefore, we deny enforcement of the FLRA's order.

### I

This case arises out of a consolidated unfair labor practice proceeding brought under the Federal Service–Labor Management Relations Statute (Statute).[1] It involves a FLRA adjudication of two unfair labor practice complaints based on charges filed by the American Federation of Government Employees, National Border Patrol Council. The complaints alleged that the INS violated section 7116(a)(1) of the Statute by interfering with the rights of bargaining unit employees to assist labor unions by prohibiting them from wearing a small union lapel pin while on duty and by lowering an employee's appearance rating because he wore a union pin.[2]

The cases were first heard separately, but by the same ALJ.[3] In both cases, the ALJ found that the INS's conduct violated the Statute. The INS filed exceptions to the ALJ's decisions with the FLRA and the FLRA consolidated the cases.

The FLRA agreed with the ALJ that the INS had committed unfair labor practices by interfering with, restraining and coercing an employee in the exercise of his rights under section 7102 to form, join, or assist a labor organization by prohibiting the employee from wearing a union lapel pin while on duty, and by lowering an employee's appearance rating for wearing a union pin. The FLRA concluded that section 7102 does grant federal employees the right to wear a union pin unless special circumstances exist, and that no special circumstances existed in this case. Accordingly, the FLRA ordered the INS to cease and desist such practices and take affirmative action to effectuate the purpose and policy of the Statute. The INS now petitions for a review of the FLRA's decision.

### II

We first address the standard of review for this appeal. Section 7123(c) provides that a review of the FLRA's order shall be on the record and in accordance with 5 U.S.C. § 706. Section 706, in turn, provides that we should not set aside agency action unless the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). The FLRA's findings of fact are to be affirmed if supported by substantial evidence. 5 U.S.C. § 7123(c). The FLRA's legal construction of the Statute is entitled to deference if it is reasoned and supportable. *INS v. FLRA*, 855 F.2d 1454, 1458 (9th Cir.1988) (*INS I*).

### III

The FLRA argues that the right to wear union buttons is found in the broad right under section 7102 to form, join or assist a labor union, which reads in relevant part:

---

1. 5 U.S.C. §§ 7101–7135.

2. Section 7116(a)(1) provides:
 For the purposes of this chapter, it shall be an unfair labor practice for an agency to interfere with, restrain, or coerce any employee in the exercise by the employee of any right under this chapter.

3. Case No. 6–CA–70732 involved the complaint that the Union violated the Statute by requiring an employee to remove his pin. Case No. 6–CA–80175 involved the complaint that the Union violated the Statute by lowering an employee's appearance rating for wearing a union pin.

Each employee shall have the right to form, join, or assist any labor organization ... freely and without fear of penalty or reprisal, and each employee shall be protected in the exercise of such right.

The FLRA argues that wearing the pin assists the Union by publicizing its existence, demonstrating employee support for the labor union, and showing pride and affiliation.

The INS argues that although publicizing the existence of the Union and demonstrating support generally fall within the scope of Section 7102, congressional intent and legal precedent indicate that section 7102 does not grant the right to wear union insignia. The INS basically adopts the reasoning advanced by the Ninth Circuit in *INS I.* There, the court pointed out that section 7102 was patterned after Section 7 of the National Labor Relations Act (NLRA). Section 7 of the NLRA provides in relevant part:

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purposes of collective bargaining or other mutual aid or protection.

29 U.S.C. § 157. The Ninth Circuit then concluded that the right to wear a union lapel pin under the NLRA was conferred by the right "to engage in other concerted activities" language, and that Congress intentionally left this NLRA language out of the Statute. *INS I*, 855 F.2d at 1459.

In reaching this conclusion, the Ninth Circuit relied on *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945). The Ninth Circuit held that in *Republic Aviation*, the Supreme Court concluded that the right to wear union buttons arose from the right "to engage in other concerted activities" under Section 7 of the NLRA. *INS I*, 855 F.2d at 1459. *Republic Aviation* involved the discharge of three employees for wearing union steward buttons in violation of the employer's no solicitation rule. The Court found that the enforcement of the no solici-

tation rule violated the NLRA because it interfered with the employees' rights under section 7 of the NLRA. *Republic Aviation*, 324 U.S. at 795–96, 65 S.Ct. at 984. The Court, however, did not hold expressly that the right to wear a union button arose only from the right "to engage in other concerted activities" in section 7. Nor can we read into the case such an implicit holding. Indeed, the Supreme Court recognized and approved the National Labor Relations Board's conclusion that:

the right of employees to wear union insignia at work has long been recognized as a reasonable and legitimate form of *union activity*, and the respondent's curtailment of that right is clearly violative of the Act.

*Id.* at 802 n. 7, 65 S.Ct. at 988 n. 7 (emphasis added). Therefore, the INS's reliance on *Republic Aviation* and the Ninth Circuit's analysis of that case, we think, is misplaced.

The INS also argues that Congress meant to circumscribe the rights of federal employees more than the rights of private employees, and that its interpretation of section 7102 is consistent with the intent of Congress. The INS cites *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 278 n. 13, 94 S.Ct. 2770, 2778 n. 13, 41 L.Ed.2d 745 (1974), to support its conclusion that Congress meant to refrain from granting federal employees the right to wear union pins. Although it is true that federal employees do not enjoy the same rights as private employees, the FLRA correctly points out that in *Letter Carriers*, the Supreme Court only discussed greater restrictions on federal employees in the context of strikes and picketing:

The absence of mention of a right to engage in concerted activities is no more than a reflection of the fact that the order does not permit federal employee unions to engage in strikes or picketing.

*Id.*

The INS also contends that to hold that the federal employee's right to wear a union pin arises from the right to assist labor unions would create a disparity between

public and private employees, because the private employee's right to assist labor unions does not include the right to wear a pin. This asserted disparity is premised, however, on the INS's conclusion that the private employee's right to wear a union pin arises from the right to engage in other concerted activities, not the right to assist labor unions. Its argument is therefore contingent on its flawed analysis of *Republic Aviation*. All other courts have grounded the private employee's right to wear union insignia in section 7 generally, not narrowly in the right to engage in other concerted activity. *See NLRB v. Floridan Hotel of Tampa, Inc.*, 318 F.2d 545, 547 (5th Cir.1953); *Fabri–Tek, Inc. v. NLRB*, 352 F.2d 577, 584–85 (8th Cir.1965); *NLRB v. Mayrath Co.*, 319 F.2d 424, 426 (7th Cir.1963).

■ The INS's argument that Ninth Circuit precedent and congressional intent compel the conclusion that the right to assist labor unions does not include the right to wear a union lapel pin is without merit. The FLRA's conclusion that section 7102, which grants "[e]ach employee ... the right to ... assist any labor organization," does confer the right to wear a union lapel pin on federal employees is well reasoned, and therefore, entitled to deference.

### IV

Alternatively, the INS argues that even if section 7102 does grant federal employees the right to wear a union pin, that right is superseded by the management's right to determine the "methods and means of performing work" under section 7106(b)(1).[4] The INS argues that this conclusion is mandated by this court's decision in *United States Dep't of Justice v. FLRA*, 727 F.2d 481 (5th Cir.1984). In that case, however, this court held only that "the decision as to whether an agent will wear a uniform on a 'city patrol' involves a determination of the 'means' of performing

work within the meaning of Section 7106(b)(1)." *Id.* at 488.

■ The INS argues that because it has the right to require uniforms, it also has the right to bar employees from adorning their uniforms with objects of their own choosing. It contends that the right to require a uniform includes the power to require uniformity. In *INS I*, the Ninth Circuit held that the right to require a uniform necessarily encompasses the right to require unadorned uniforms:

> The uniform requirement fosters discipline, promotes uniformity, encourages esprit de corps, and increases readiness. To allow employees to adorn their uniforms with objects of their own choosing undermines the very purpose that uniforms serve.

*INS I*, 855 F.2d at 1464. We cannot immediately accept the conclusion the Ninth Circuit reached because in assessing management's right to require unadorned uniforms, it simply assumed that management's statutory right to require a uniform supersedes the employee's statutory right to assist labor unions by wearing a pin. Nothing in the Statute, however, subordinates the rights granted to employees under section 7102 to the rights granted management under section 7106(b)(1). Since section 7106(b) does not explicitly supersede other rights granted under the chapter, the FLRA's conclusion that management's statutory right to prescribe a uniform does not automatically include the right to prohibit union pins is reasonable and entitled to deference.

### V

■ In order to determine whether a uniformed border patrol agent has the right to wear a union pin while on duty, we employ the "special circumstances" test that has been widely applied by the National Labor Relations Board (NLRB) and the courts in cases involving the right of private employees to wear union insignia and which has

---

**4.** Section 7106(b)(1) provides:
Nothing in this section shall preclude any agency and any labor organization from negotiating at the election of the agency, on the numbers, types, and grades of employees or positions assigned to any organizational subdivision, work product or tour of duty, or on the technology, methods, and means of performing work.

also been applied by the FLRA in cases involving the right of public employees to wear a union lapel pin. *See Davison–Paxon Co. v. NLRB*, 462 F.2d 364 (5th Cir. 1972); *Fabri–Tek, Inc. v. NLRB*, 352 F.2d 577 (8th Cir.1965); *Page Avjet Corp. v. District Lodge No. 141, Int'l Ass'n Machinists & Aerospace Workers*, 275 NLRB 773 (1985); *INS II*, 38 FLRA 701 (1990); *Federal Aviation Administration, Spokane Tower/Approach Control*, 15 FLRA 135 (1984). Under the "special circumstances test," the employee has the right to wear a union pin on his uniform absent special circumstances. *INS II*, 38 FLRA at 715–718.

The NLRB, FLRA, and the courts have considered a number of factors when presented with the issue of whether employees may wear union insignia at work. They have looked to the circumstances in which the insignia is worn, the physical appearance of the insignia, the nature of the employer's activity and the employer's need for production, safety and discipline. *Id.* at 715. In cases where special circumstances were found to exist, there has been evidence linking the wearing of union insignia to a disruption of the employer's operation's and maintenance of safety and discipline. *Id.* at 716–17.

Below, the INS argued that special circumstances exist because allowing border patrol agents to wear union pins on their uniform while on duty would interfere with operations, morale, pride, esprit de corps, regimentation and discipline. It also argued that the wearing of union pins would create factionalism, divisiveness and the appearance of impartiality. Finally, the INS emphasized the para-military nature of the border patrol's operations.

■ The FLRA has recognized that military regulations are entitled to special deference. In *American Federation of Government Employees, AFL–CIO, Local 3006 and Idaho Army and Air National Guard*, 32 FLRA 539 (1988), the FLRA found that military technicians did not have the right to wear union badges on their uniforms while at work:

> Nonmilitary additions to or modifications of the required uniform are incompatible with the purpose of maintaining the military identity of civilian technicians which is necessary to the accomplishment of their mission.... In our view, the military uniform can fulfill the purpose for which the Agency determined that it was a necessary means only if it remains an exclusively *military* uniform.

*Id.* at 543. Below, the FLRA, relying on its decision in *INS II*, pointed out that the border patrol was not military, and then concluded that the distinction between military and nonmilitary employees was critical. We, of course, concede that the border patrol is not military. Nevertheless, it is a para-military law enforcement unit, and as such, has many of the same interests as the military in regulating its employees' uniforms.

■ The INS's anti-adornment/uniform policy is critical to its mission, in that it promotes uniformity, esprit de corps and discipline, and creates an appearance of neutrality and impartiality. Thus, even though the border patrol is not military, we hold that its law-enforcement mission and the means of accomplishing that mission are comparable in significant ways. It follows that its anti-adornment/uniform policy is similarly entitled to deference. We further hold that, when a law enforcement agency enforces an anti-adornment/uniform policy in a consistent and nondiscriminatory manner, a special circumstance exists, as a matter of law, which justifies the banning of union buttons.[5] Therefore, in the instant case, the border patrol agents do not have the statutory right to wear union lapel pins. Consequently, the INS has not committed any unfair labor practices by enforcing its policy or docking an employee's appearance rating for a violation of that policy.

**5.** *See Burger King Corp. v. N.L.R.B.*, 725 F.2d 1053, 1055 (6th Cir.1984) (where court held that as a matter of law, a special circumstance exists where employer enforces a policy that its employees who have contact with the public may wear only authorized unadorned uniforms).

## VI

Because we have held that under the Statute the INS may prohibit union buttons, we must address whether under the First Amendment the employee's right might yet be protected.[6] We assume, for the purpose of deciding this case, that wearing a union pin does constitute speech protected by the First Amendment.

### A

We begin with *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), in which the Supreme Court established the test for determining the limits that may be placed on government employees' speech rights. *Pickering* held that the First Amendment protects the rights of public employees "as citizens to comment on matters of public concern" in connection with the operation of the government agencies for which they work. *Id.* at 568, 88 S.Ct. at 1734. The Supreme Court recognized, however, that the government has legitimate interests in regulating the speech of its employees that differ significantly from its interests in regulating the speech of people generally. *Id.* Accordingly, the Court held that the scope of a public employee's First Amend-

ment rights must be determined by balancing the "interests of the [employee], as a citizen, in commenting upon matters of public concern, and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.; Connick v. Myers*, 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983). First, the employee must establish that his speech involves a matter of public concern. *Coughlin v. Lee*, 946 F.2d 1152, 1154 (5th Cir.1991). Whether speech addresses a matter of public concern is to be "determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48, 103 S.Ct. at 1690. This determination is a question of law to be resolved by the court. *Coughlin*, 946 F.2d at 1152. If the speech at issue involves a matter of public concern, and is thus protected by the First Amendment, the employer then must show that its interest in promoting the efficiency of the services provided by its employees outweighs the employee's interest in engaging in the protected speech. *Connick*, 461 U.S. at 150, 103 S.Ct. at 1691; *Rankin v. McPherson*, 483 U.S. 378, 388–89, 107 S.Ct. 2891, 2899, 97 L.Ed.2d 315 (1987).[7]

---

6. The FLRA does not argue that the anti-adornment policy violates the First Amendment. The Union raised this issue as intervenor.

7. We recognize that placing the burden on the government seems at odds with what this court stated in *Kinsey v. Salado Independent School District*, 950 F.2d 988 (5th Cir.1992) (en banc). In *Kinsey*, this court stated:

> As recently discussed in *Coughlin v. Lee*, 946 F.2d 1152 (5th Cir.1991), if only speech is in issue, the plaintiff, as a matter of law, must show: first, that it involves a matter of public concern ..., and second, that, "the interests of the [employee], as a citizen, in commenting upon matters of public concern [outweighs] the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." If a plaintiff satisfies these issues, the case goes to the jury (on causation).

*Kinsey*, at 992–93. In this dicta, however, there is a slip of the pen resulting in a misstatement of what we said in *Coughlin*. In *Coughlin*, this court stated:

> As a threshold requirement, a public employee claiming violation of freedom of speech

must show that his speech is entitled to judicial protection under the First Amendment. It is so entitled only if it addresses a matter of "public concern".... If the speech at issue does address a matter of public concern, the court then engages in the so-called *"Pickering/Connick test,"* balancing *"the interests of the [employee] ... [against] the interest of the [State]...."* The more central a matter of public concern is to the speech at issue, the stronger the *employer's showing* of counterbalancing governmental interests must be.

*Coughlin*, 946 F.2d at 1157. Thus, the *Coughlin* court placed the burden of showing that the government's interest outweighs the employee's interest on the government.

In other cases as well, this court has, also in dicta, incorrectly placed this burden on the employee. *See, e.g., Farias v. Bexar City Bd. of Trustees for M.M.H.R. Serv.*, 925 F.2d 866, 876 (5th Cir.1991). We hold, as the en banc court recognized in *Kinsey*, that *Coughlin* correctly places the different burdens in First Amendment cases involving public employees, and that the burden of proving that the government's interest outweighs the employee's interest is properly placed on the government.

"[T]he State's burden in justifying a particular [action or policy] varies depending upon the nature of the employee's expression." *Connick*, 461 U.S. at 150, 103 S.Ct. at 1692. "The more central a matter of public concern the speech [or association] at issue, the stronger the employer's showing of counter-balancing governmental interest must be." *Coughlin*, 946 F.2d at 1157. The determination of the appropriate balance is also a legal determination to be made by the court. *Connick*, 461 U.S. at 150, 103 S.Ct. at 1691.

### B

■ For the purposes of this case, we assume, without deciding, that wearing the union button does constitute speech on a matter of public concern.[8] Thus, we must determine whether the INS's interest in promoting efficiency in carrying out its mission outweighs the border patrol agents' interest in wearing union lapel pins. The Supreme Court has held that the impact of the speech on the discipline by superiors and the harmony among co-workers, the impact of the speech on close personal relationships for which personal loyalty and confidence are necessary, and the degree to which the speech impedes the employee's performance or interferes with the regular operations of the employer are relevant factors to consider when weighing the two competing interests. *Rankin*, 483 U.S. at 388, 107 S.Ct. at 2899; *Pickering*, 391 U.S. at 570–73, 88 S.Ct. at 1735–37. Also relevant are the manner, time, and place in which the border patrol agents wear the pins. *Connick*, 461 U.S. at 152, 103 S.Ct. at 1692. As discussed above, the INS argues that its anti-adornment policy, as an essential part of its uniform code, fosters discipline, promotes uniformity, encourages esprit de corps, and enhances the identification of its employees. The INS emphasizes the para-military nature of the border patrol agents' duties and argues that the wearing of union pins would create divisiveness and an appearance of partiality.

■ The Supreme Court has given deference to military uniform regulations when a public employee's First Amendment rights were at issue. In *Goldman v. Weinberger*, 475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986), the Supreme Court held that the Air Force Policy prohibiting officers from wearing head gear while on duty was not a violation of the officers' First Amendment rights. The officer challenging the regulation was an Orthodox Jew who wanted to wear a yarmulke. The Court held that, when challenged on First Amendment grounds, its review of military regulations is much more deferential than its review of civil laws and regulations:

> The military need not encourage debate or tolerate protest to the extent that such tolerance is required of the civilian state by the First Amendment; to accomplish its mission, the military must foster instinctive obedience, unity, commitment, and esprit de corps.

*Id.* at 507, 106 S.Ct. at 1313. In *Kelley v. Johnson*, 425 U.S. 238, 247, 96 S.Ct. 1440, 1445, 47 L.Ed.2d 708 (1976), the Court held that a law enforcement agency's "[c]hoice of organization, dress, and equipment for law enforcement personnel is a decision entitled to the same sort of presumption of legislative validity as are state choices designed to promote other aims within cognizance of the State's police power." Just as we have held earlier, that the INS's anti-adornment policy is entitled to deference under the special circumstance test because of the para-military nature of its operations, we now hold that a law enforcement agency's anti-adornment policy is also entitled to deference when weighing the government's interest against the employee's interest under the *Pickering/Connick* First Amendment test.

We think this deference is particularly warranted in this case. It is reasonable to conclude that allowing border patrol agents to wear union pins while on duty would create factionalism, interfere with discipline and create an appearance of partiality. At oral argument, for example, the

---

**8.** The Ninth Circuit also assumed, without deciding, that wearing a union button constituted speech on a matter of public concern. *INS I*, 855 F.2d at 1466.

Union stated that an important purpose of its members wearing the pin is to promote the solidarity of the Union. Solidarity against what and whom? Obviously against policies and practices of the INS they oppose and against those who differ with their position. It is not unreasonable to assume that allowing this schism to manifest itself in the form of a pin on the uniforms of the pro-union agents will create added tension; in short, there will be occasions when a union button can be interpreted as a symbol of defiance against supervisors and as a split in solidarity among union and non-union agents, which will have an impact on mission, discipline, and esprit de corps. Finally, it is reasonable to conclude that allowing border patrol agents to wear union pins would interfere with an appearance to the public of neutrality and impartiality, which is important to the mission of all law enforcement agencies.

 The FLRA concluded below, and argues on appeal, that these deleterious effects are only speculative. We agree with the FLRA that the INS has not demonstrated with anecdotal evidence that these deleterious effects will in fact occur if agents are allowed to wear the pins. The Supreme Court, in *Connick,* held, however, that it is not necessary "for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of the working relationship is manifest before taking action." We think that this observation is especially applicable here where law enforcement is involved and the agency has an overriding interest in maintaining discipline, efficiency, and effectiveness in protecting the public safety and the safety of its officers. We therefore hold that the government has satisfied its burden by reasonably asserting that allowing border patrol agents to wear union lapel pins on their uniform while on duty will adversely affect its law enforcement mission for the reasons we have discussed in this opinion. Therefore, we hold that the INS's interest in promoting the efficiency of the border patrol by prescribing any adornments on the agents' uniforms outweighs the agents' interest in wearing a union lapel pin while on duty. This balancing results in only a minimal intrusion of the free speech rights of union employees. They can continue to express their support for the Union in myriad other ways that are absolutely unaffected by our decision today. Consequently, the INS anti-adornment policy does not violate the agents' First Amendment rights.

## VII

 In conclusion, we hold that the right of public employees to wear union pins is within the general grant of rights under Section 7102. We recognize, however, that the right to wear union pins is not absolute. We hold that since nothing in the Statute indicates whether the employee's right to assist labor unions by wearing a union pin or the management's right to prescribe a uniform supersedes the other, the special circumstances test must be used to determine whether there is any justification for an employer's anti-adornment policy that bars the wearing of union pins. We hold, that as a matter of law, when a law enforcement agency enforces an anti-adornment policy in order to encourage uniformity, discipline, esprit de corps and create an appearance of impartiality—qualities that are critical to the border patrol's mission—a special circumstance exists that justifies prohibiting the wearing of union pins. Therefore, in the case at hand, the border patrol agents do not have the statutory right to wear union pins while on duty. Accordingly, the INS did not commit an unfair labor practice by requiring the agent to remove his pin or by lowering his appearance rating for wearing the pin.

We also hold that the INS's anti-adornment policy does not violate the border patrol agents' First Amendment rights. The INS's interest in promoting the efficiency of the services provided by the patrol outweigh any interests the agents have in wearing union lapel pins while on duty.

ENFORCEMENT DENIED.