Urbano HERRERA and Communications Workers of America, Local 6127

v.

MEDICAL CENTER HOSPITAL, et. al.

No. CIV.A. MO–01–CA–026.

United States District Court, E.D. Louisiana.

Aug. 5, 2002.

David Van Os, Benjamin Cox, Matthew Gerald Holder, San Antonio, TX, for the Plaintiffs.

William Stacy Trotter, Shafer, Gilliland, Davis, et al., Odessa, TX, for the Defendants.

## ORDER AND REASONS

VANCE, District Judge.

Before the Court are plaintiffs' and defendants' cross-motions for summary judgment on plaintiffs' claims challenging the discipline he received for wearing a union button at work. The Court finds that plaintiff Herrera's conduct involved speech on a matter of public concern. The Court also finds that contested issues of fact must be resolved at trial before the Court can conduct the *Pickering* balance test, which requires weighing the public employer's interest in promoting the efficiency of the services it provides against the employee's interest in engaging in protected speech. Therefore, plaintiffs' and defendants' cross-motions for summary judgment are DENIED. Furthermore, (1) defendants' motion for summary judgment on the issue of whether plaintiffs' constitutional rights were deprived by an official policy is DENIED; (2) defendants' motion for summary judgment on the issue of qualified immunity for each of the individual defendants named in plaintiffs' complaint is GRANTED; and (3) defendants' motion for summary judg-ment on the issue of plaintiff CWA's standing is DENIED.

## I. Background

Plaintiff Urbano Herrera was hired by the Ector County Hospital District d/b/a Medical Center Hospital ("Hospital") as a carpenter on January 13, 1991. The Ector County Hospital District is a political subdivision created by Texas statute, and its Board of Directors is popularly elected by Ector County voters.

In the summer of 1999, Herrera became a labor organizer for Communications Workers of America ("CWA"). Herrera attests that he organized weekly meetings of other Hospital employees at which they discussed their dissatisfaction with working conditions at the Hospital, including problems resulting from the Hospital's retention of a new outside management company. At one of the union meetings, union officials handed out union buttons. The next day, Herrera and about 30 other Hospital employees wore the buttons on their uniforms. The buttons stated "Union Yes." Herrera also wore the pin to work the next two days. The parties dispute the extent to which Herrera's job involved contact with the public and thus whether these pins were seen by either patients or the general public.

On the third day that Herrera wore the union button, Tim Daniels, the Hospital's General Maintenance Supervisor, noticed that Herrera and another employee, Gerardo Medrano, wore union pins. The Hospital's dress code policy contains an anti-adornment provision under which "ONLY pins representing the professional association and the most current hospital service award may be worn." Daniels informed Herrera and Medrano that they were in violation of the dress code policy and asked them both to remove the buttons from their uniforms. Medrano complied, but

Herrera refused. Daniels then contacted John Durham, the Hospital's Director of Engineering, who confronted Herrera in the cafeteria and ordered Herrera to take off the button. Herrera again refused, and Durham ordered Herrera to come to his office, which he did. Durham explained to Herrera that the Hospital's dress code policy did not permit employees to wear buttons. Herrera then agreed to take off the button. Durham also told Herrera that he would be reprimanded if he violated the dress code policy again.

After leaving Durham's office, Herrera called Clay Everett, President of CWA Local 6127, and told him what had happened. Everett informed Herrera that the Hospital could not order him to remove the button. Herrera put his button back on. Later that day, Durham saw Herrera and again asked him to take off the button. Herrera refused and Durham ordered Herrera to come to his office, where Herrera continued to refuse to remove his button. Durham told Herrera to take a work break and return in 30–45 minutes. Herrera returned to Durham's office with Everett and Annette Armstrong, the Executive Vice President of the CWA local. Durham informed Herrera that the Hospital would suspend him for three days without pay for his refusal to take off the button. The suspension has been recorded as a permanent disciplinary mark on Herrera's employment record. One month after the suspension, Herrera was informed that his annual raise would be only 3%, as opposed to the usual 4%, because of the dress code violation. In a job evaluation conducted at that time, Herrera received high marks in every category except for his violation of the dress code policy.

The record indicates that Herrera may be the only Hospital employee ever disciplined for a violation of the anti-adornment policy. Herrera appealed the suspension to the Hospital's grievance committee, chaired by David Meisell, the Director of Human Resources for the Hospital. Herrera had a hearing on December 28, 1999, and the committee affirmed Herrera's suspension.

On February 20, 2001, CWA and Herrera sued the Hospital, Ector County Hospital District Board of Directors, the elected members of the Board of Directors (Judy Hayes, Abraham Torres, Joe C. Buice, William Hetzler, James M. Gaddy, Mary Thompson and Virgil Trower) and some managers and supervisors within the Hospital (Tim Daniels, John Durham, David Meisell, John Chamberlain, Craig Covington, J. Michael Stephans and William W. Webster). Plaintiffs brought the action under 42 U.S.C. § 1983 alleging violations of state law and the First and Fourteenth Amendments, and seeking injunctive, equitable, and declaratory relief, and attorneys' fees. Plaintiffs moved for summary judgment. Defendants filed a motion to dismiss, and, in the alternative, a motion for summary judgment.

## II. Discussion

### A. Legal Standard

Summary judgment is appropriate when there are no genuine issues as to any material facts, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2551, 91 L.Ed.2d 265 (1986). The court must be satisfied that no reasonable trier of fact could find for the nonmoving party or, in other words, "that the evidence favoring the nonmoving party is insufficient to enable a reasonable jury to return a verdict in her favor." *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir.1990); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

The moving party bears the burden of establishing that there are no genuine issues of material fact. *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1445 (5th Cir. 1993). A factual dispute precludes a grant of summary judgment if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *See Hunt v. Rapides Healthcare System, LLC*, 277 F.3d 757, 2001 WL 1650961 (5th Cir. 2001) (citations omitted).

If the dispositive issue is one for which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2552; *Lavespere*, 910 F.2d at 178. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553.

Here, defendants filed a motion to dismiss, or, in the alternative, a motion for summary judgment under Rule 56. The Court will treat defendants' motion as one for summary judgment because matters outside of the pleadings have been presented to and not excluded by the Court. *See* FED. R. CIV. P. 12(b)(6) and 12(C).

## B. First Amendment and Public Employee Speech

At the heart of these cross-motions for summary judgment is whether the Hospital's decision to discipline Herrera violates Herrera's rights to freedom of speech or freedom of association under the First Amendment.[1] The Hospital argues that it was merely enforcing a content-neutral anti-adornment policy. The policy at issue, which was implemented in August 1993 and revised in July 1999, states that "ONLY pins representing the professional association and the most current hospital service award may be worn."[2] (Def.'s Mot. for Summ. J., App. at Ex. Al.) The policy requires that male employees who regularly come in contact with patients and/or visitors wear a dress shirt, pants, and tie. *Id.* As a carpenter, Herrera is instead subject to the Hospital's dress code that pertains to carpenters, electricians, cabinet-makers and plumbers. Herrera's uniform consists of a gray shirt and gray pants. (Pl.'s Mot. Summ J., App. at 49.)

Defendants assert that the rule proscribes almost *all* pins and therefore is not content-based. The record indicates that employees are allowed on certain occasions to wear pins pertaining to the Great American Smoke–Out Day, blood donations, and the annual Permian Basin High School versus Odessa High School football game. The Hospital's Director of Human Resources asserted in his affidavit that employees can seek authorization from the Dress Code Committee and/or the Administrator to wear pins on a case-by-case basis. (Def.'s Mot. for Summ. J., App. at Ex. A.) The written dress code policy does

---

1. The parties have not briefed and the Court expresses no opinion as to plaintiffs' claims under the Texas Constitution and state statutory law.

2. The dress code contains a policy statement which provides:
 "The uniform or clothing worn by the employee reflects pride in Medical Center Hospital and the service given to the patient. The employee's responsibility is to maintain high standards by presenting a neat, clean, well-groomed appearance, at all times. It is the Department Manager's and/or the Supervisor's responsibility to enforce the dress code uniformly throughout Medical Center Hospital."
 (Def.'s Mot. for Summ. J., App. at Ex. A1.)

not provide a procedure for seeking such an exception. (Def.'s Mot. for Summ. J., App. at Ex. A1.) Nor is it suggested that Herrera would have been given permission to wear his pin had he asked for authorization to do so.

### 1. The Connick/Pickering Analysis

The government may not condition public employment on a basis that violates the First Amendment rights of its employees. *Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983). Government employees "have not relinquished the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest." *United States v. National Treasury Employees Union,* 513 U.S. 454, 465, 115 S.Ct. 1003, 1012, 130 L.Ed.2d 964 (1995) (citations and internal quotations omitted). At the same time, the government is to a certain extent entitled to manage employees, including hiring, firing and disciplining them, like other employers. "[T]he government as employer indeed has far broader powers than does the government as sovereign." *Waters v. Churchill,* 511 U.S. 661, 671, 114 S.Ct. 1878, 1886, 128 L.Ed.2d 686 (1994). To determine the validity of restraints on public employees' speech, the Court must "arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *See Pickering v. Board of Education of Township High School District 205,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811; *see also National Treasury,* 513 U.S. at 465, 115 S.Ct. at 1012.

To determine whether a public employer's action has impermissibly infringed free speech rights, the Fifth Circuit employs a four-step analysis. *Branton v. City of Dallas,* 272 F.3d 730, 739 (5th Cir.2001); *Harris v. Victoria Independent School District,* 168 F.3d 216, 220 (5th Cir.1999), *cert. denied,* 528 U.S. 1022, 120 S.Ct. 533, 145 L.Ed.2d 413 (1999); *Teague v. City of Flower Mound, Texas,* 179 F.3d 377, 380 (5th Cir.1999). First, the employee must prove that his speech touches on or involves a matter of public concern. Second, if the speech can be fairly characterized as constituting a matter of public concern, the court must balance the employee's interest, as a citizen, in commenting upon matters of public concern against the interest of the State, as an employer, in promoting the efficiency of the public services provided. *Rankin v. McPherson,* 483 U.S. 378, 388, 107 S.Ct. 2891, 2899, 97 L.Ed.2d 315 (1987); *see also Waters v. Churchill,* 511 U.S. at 674, 114 S.Ct. at 1887. These first two steps are "legal in nature and are for the court to resolve." *Branton,* 272 F.3d at 739; *Connick,* 461 U.S. at 147–148, 103 S.Ct. at 1684. The third step is to decide whether the protected speech was a substantial or motivating factor in the adverse employment decision. The fourth step is to determine whether the employer would have made the same employment decision in the absence of the protected speech. These final two steps are factual in nature. *Branton,* 272 F.3d at 739. When a plaintiff's claims arise under both freedom of speech and freedom of association, as is the case here, the freedom of association claims are analyzed under the same *Pickering* balance test used to determine the success of the freedom of speech claims. *Anderson v. Pasadena Independent School District,* 184 F.3d 439, 444 (5th Cir.1999).[3]

**3.** When a plaintiff brings a freedom of associ- ation claim arising from union organization

## 2. Step One: Public Concern

■ For plaintiffs' free speech claims, then, the first step is to determine whether the employee spoke "as a citizen upon matters of public concern" rather than "as an employee upon matters only of personal interest." *Connick,* 461 U.S. at 147, 103 S.Ct. at 1690. *See also INS v. FLRA,* 955 F.2d 998, 1005 (5th Cir.1992); *Coughlin v. Lee,* 946 F.2d 1152, 1154 (5th Cir.1991). Private speech that involves nothing more than a complaint about a change in the employee's own duties may give rise to discipline without imposing any special burden of justification on the government employer. *Connick,* 461 U.S. at 148–49, 103 S.Ct. at 1690–91. Whether speech addresses a matter of public concern is to be "determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147–48, 103 S.Ct. at 1690. This determination is a question of law for the Court to resolve. *Coughlin,* 946 F.2d at 1152.

The Fifth Circuit has identified certain categories of speech that touch upon the public concern. For example, "associating with political organizations and campaigning for a political candidate [relates] to a matter of public concern." *Vojvodich v. Lopez,* 48 F.3d 879, 885 (5th Cir.1995).

Speech "made against the backdrop of ongoing commentary and debate in the press involves the public concern." *Kennedy v. Tangipahoa Parish Library Board of Control,* 224 F.3d 359, 373 (5th Cir.2000).[4] Speech relating to racial discrimination is "inherently of public concern." *Victor v. McElveen,* 150 F.3d 451, 456 (5th Cir. 1998). On the other hand, the Fifth Circuit has identified some speech that is not of public concern. Speech concerning a purely personal labor dispute, such as a disagreement between an employee and an employer about the conditions of employment, is not of public concern. *Ayoub v. Texas A & M University,* 927 F.2d 834, 837 (5th Cir.1991) (finding employment dispute private because it pertained only to plaintiff's own compensation).[5] Challenges made by an individual to one's work conditions and the quality of the work environment are private. *Connick,* 461 U.S. at 148, 103 S.Ct. at 1690.

■ The Fifth Circuit recognizes that some speech contains both public and private elements. In cases of "mixed speech," the Fifth Circuit has ruled that courts are "bound to consider the *Connick* factors of content, context and form, and determine whether the speech is public or private based on these factors." *Teague,*

---

activity but does not bring any freedom of speech claims, the Fifth Circuit has squarely held "that no independent proof of public concern is required." *Boddie,* 989 F.2d at 749. This is in part due to the "higher likelihood that much more of the range of such activity than the range of employee speech is not solely personal and is inevitably of public concern." *Id.; see also Breaux v. City of Garland,* 205 F.3d 150, 157 n. 12 (5th Cir. 2000).

4. *See also Branton,* 272 F.3d at 739; *Harris,* 168 F.3d at 222; *Moore v. City of Kilgore,* 877 F.2d 364, 370 (5th Cir.1989); *Gonzalez v. Benavides,* 774 F.2d 1295, 1301 (5th Cir. 1985).

5. *See also Teague,* 179 F.3d at 383 (finding speech private because the parties' focus was "primarily on clearing their names"); *Gillum v. City of Kerrville,* 3 F.3d 117, 121 (5th Cir. 1993) (speech deemed private because plaintiff's focus was on his own role in a contentious investigation); *Stewart v. Parish of Jefferson,* 951 F.2d 681, 683 (5th Cir.1992) (speech private because it pertained to personal abuse of plaintiff and because of a particular friendship maintained by plaintiff). Similarly, the Third Circuit has found that speech related "solely to mundane employment grievances" is private. *Sanguigni v. Pittsburgh Board of Public Educ.,* 968 F.2d 393, 399 (3rd Cir. 1992).

179 F.3d at 382. The Court's obligation is "to decide whether the speech at issue... was made primarily in the plaintiff's role as citizen or primarily in his role as employee." *Terrell v. Univ. of Texas System Police*, 792 F.2d 1360, 1362 (5th Cir.1986).

Although the Fifth Circuit has never expressly so held, all signs point in the direction of finding that a pin pertaining to labor organizing is of public concern. No court has held that such speech is of private concern, and the Fifth Circuit has "assumed without deciding" that such speech is of public concern. *INS*, 955 F.2d at 1006 (assuming without deciding that wearing a union lapel pin was matter of public concern). More explicitly, the Fifth Circuit has recognized the "reality that speech in the context of union activity will seldom be personal; most often it will be political speech." *Boddie v. City of Columbus, Mississippi*, 989 F.2d 745, 749 (5th Cir.1993).

Similarly, the Supreme Court has stated that "labor relations are not matters of mere local or private concern." *Thornhill v. State of Alabama*, 310 U.S. 88, 103, 60 S.Ct. 736, 744, 84 L.Ed. 1093 (1940). The D.C. Circuit has found that "the urge to unionize certainly falls within the category of expression that 'is fairly considered as relating to any matter of political, social, or other concern to the community.'" *American Postal Workers Union, AFL–CIO v. United Postal Service, American Postal Workers Union*, 830 F.2d 294, 301 (D.C.Cir.1987) (citing to *Connick*, 461 U.S. at 146, 103 S.Ct. at 1690). And, in *Mattix*, a district court stated that "engaging in union activities are generally a matter of public concern." *Mattix v. Hightower*, 1998 WL 246671, *7 (N.D.Tex.1998).[6]

The Court finds that Herrera's speech is of public concern, and it reaches this conclusion through an analysis of the *Connick* factors of content, form, and context. In terms of content, the speech was public in that it encouraged Hospital workers to join a union. On its face, "Union Yes" pertains to labor relations in general; its relation to Herrera's own terms of employment is secondary and indirect. The form of the speech is unquestionably public, as it took the form of a pin. Pins have long been held a public forum for expression. *Smith v. United States*, 502 F.2d 512, 516 (5th Cir.1974). In terms of context, Herrera wore the pin amid a campaign to unionize Hospital employees. In the months prior to this incident, CWA's membership recruitment was on the rise. Although the speech was made at the workplace (as opposed to in the community), speech expressed in the workplace has been deemed to be public when the speech relates to the workplace (and not solely to the employee). *Branton*, 272 F.3d at 740. Furthermore, the context was public in that the pin was worn in common areas, such as the cafeteria, where fellow coworkers could see it. Taking the three factors together, the Court finds, as a matter of law, that Herrera's speech is of public concern and is therefore entitled to First Amendment protection.

---

**6.** *See also McGill v. Board of Educ.*, 602 F.2d 774, 778 (7th Cir.1979); *Hanover Township Fed'n of Teachers v. Hanover Community Sch. Corp.*, 457 F.2d 456, 459 (7th Cir.1972); *Labov v. Lalley*, 809 F.2d 220, 222 (3rd Cir. 1987) (finding that "efforts of public employees to associate together... involve associational interests which the first amendment protects"); *Terry v. Village of Glendale Heights*, 1989 WL 106623, *6 (N.D.Ill.1989) (noting that "speech arising in the context of union organization efforts has long been held to be a matter of public concern"); *Scott v. Goodman*, 961 F.Supp. 424, 435 (E.D.N.Y. 1997) (holding that "union membership and activities constitute matters of public concern").

The Court recognizes that employees cannot simply call on union assistance in order to elevate a personal grievance to the status of a public concern. *See Boals v. Gray*, 775 F.2d 686, 696 (6th Cir.1985)(holding that asking for a union representative when threatened with disciplinary action "is not indicative of speech... touching on a matter of public concern"). The Court, however, finds defendants' attempt to classify Herrera's speech as a personal employment grievance unavailing. Defendants cite to Herrera's stated purpose for wearing the button: "to express his support for himself and fellow employees joining and assisting a labor organization in order to improve their working conditions, protect themselves in their personal labor, and obtain the benefit of union representation...." (Pl.'s Complaint at 6.) The collective and public nature of Herrera's speech is evident from the face of these remarks. This is simply not a case of an individual upset with or embroiled in a particular employment grievance with his superiors. Nor, for that matter, does the record indicate that plaintiff was attempting, with this pin, to turn a personal grievance into a "cause celebre."

### 3. Step Two: The *Pickering* Balance Test

 Because the Court holds that Herrera's speech touches upon a matter of public concern, the Court advances to step two of the analysis, the so-called *Pickering* balance test. In step two, the government bears the burden of justifying its adverse employment action by showing that its interest in promoting the efficiency of the services it provides outweighs the employee's interest in engaging in the protected speech. *Rankin v. McPherson*, 483 U.S. at 388, 107 S.Ct. at 2899. "[T]he State's burden in justifying a particular [action or policy] varies depending upon the nature of the employee's expression." *Connick*, 461 U.S. at 150, 103 S.Ct. at 1692. "The more central a matter of public concern the speech [or association] at issue, the stronger the employer's showing of counter-balancing governmental interests must be." *Coughlin*, 946 F.2d at 1157. Relevant factors to consider in this analysis are the impact of the speech on employee performance, discipline by superiors, harmony among co-workers, close personal relations for which personal loyalty and confidence are necessary, and the regular operations of the employer. *Rankin*, 483 U.S. at 387, 107 S.Ct. at 2899; *Pickering*, 391 U.S. at 570-73, 88 S.Ct. at 1735-37. Also relevant are the manner, time and place in which the speech is expressed. *Connick*, 461 U.S. at 152, 103 S.Ct. at 1692. The determination of the appropriate balance is a legal determination for the court. *Connick*, 461 U.S. at 150, 103 S.Ct. at 1691; *INS*, 955 F.2d at 1006. Importantly, the existence of contested issues of material fact will preclude a district court from completing the balance test upon a motion for summary judgment. *McPherson v. Rankin*, 736 F.2d 175 (5th Cir.1984). That is the case here.

 A number of factual issues must be resolved in this case before the Court may perform the *Pickering* balancing test. First, the evidence conflicts as to whether Herrera's employment involves a significant amount of interaction with the public. When considering the validity of anti-adornment policies both as applied and on their face, courts consistently look to the nature and extent of the public employee's interaction with the public. In the military and law enforcement context, for example, the Fifth Circuit has recognized the importance of conveying neutral authority to the general public. *Daniels v. City of Arlington*, 246 F.3d 500, 504 (5th Cir.2001)(rejecting a challenge to anti-

adornment policy brought by a police officer desiring to wear a gold cross pin on his uniform and noting that the city has the right to promote an "impartial police force by maintaining its police uniform as a symbol of neutral government authority"); *INS*, 955 F.2d at 1006 (rejecting challenge to anti-adornment policy brought by border patrol agent desiring to wear union-related pin and noting that union pins "would interfere with an appearance to the public of neutrality and impartiality"). A public employee's interaction with the general public has also been considered an important factor to consider in the *Pickering* balance test outside of the military and law-enforcement context. In *Smith v. United States,* for example, the Fifth Circuit considered the First Amendment rights of a clinical psychologist who had been terminated by a Veterans Hospital for wearing a peace pin in contravention of a hospital policy that prohibited uniformed employees from wearing peace pins while on duty. *Smith,* 502 F.2d at 516. The Fifth Circuit found that the physician "could not use that area of the hospital where patients are confined for treatment as a platform for the exercise of prohibited and unrestrained free speech," but noted that the psychotherapist *"would have been free* to wear his pin when not on duty in the psychotherapeutic ward." *Id.* at 519 (emphasis added). In a case in which employees had no clear contact with the public, the Second Circuit struck down the New York Transit Authority's anti-adornment policy as overbroad, noting that "where government employees are not in contact with the public, even controversial political remarks in the workplace... [pose] only a 'minimal' danger to the agency's effective functioning." *Scott v. Meyers,* 191 F.3d 82, 88 (2nd Cir.1999)(citing *Rankin,* 483 U.S. at 390–91, 107 S.Ct. 2891).

Plaintiffs assert that Herrera's employment involves minimal and infrequent contact with the public. (Pl.'s Complaint at 5; Pl.'s Mot. for Summ. J., App. at 49.) Defendants challenge that characterization. (Def.'s Reply to Pl.'s Mot. for Summ. J. at 4.) The Hospital's Director of Human Resources states in his affidavit that "the Hospital's carpenters regularly come into contact with other hospital personnel and the public," noting that thousands of people from the community enter the Hospital. (Def.'s Mot. for Summ. J., App. at Ex. 1.) Virtually no evidence indicates the extent to which the "Union Yes" pins were visible to patients or to the general public.

Were Herrera a policeman for the city, or even a doctor at the Hospital, the Court could perhaps assume that his employment entailed significant interaction with the public. The same is not true for a hospital carpenter. Because the nature and extent of interaction with the public is an integral part of the *Pickering* balance test, and because the evidence conflicts on the extent of Herrera's contact with the public, the Court finds that the issue must be resolved at trial.

A second outstanding issue of fact involves whether Herrera's speech caused or threatened to cause a disruption of the Hospital's efficient functions. In *Rankin,* the Supreme Court held that "interference with work, personnel relationships, or the speaker's job performance can detract from the public employer's function." *Rankin,* 483 U.S. at 388–89, 107 S.Ct. at 2899. *Rankin* and *Connick* together set forth the parameters of a public employer's burden to prove that the public employer's ability to function effectively outweighs a plaintiff's interest in protected speech. In *Rankin,* the public employer failed to carry its burden under the *Pickering* balance test because it offered "no evidence that [the speech] interfered with

the efficient functioning of the office." *Id.* It should be noted that the speech at issue in *Rankin*—expressing support for an assassination attempt on the United States President—certainly had at least some potential to disrupt the employer's functions. Thus *Rankin* indicates that at least some evidence is necessary. At the same time, in *Connick* the Supreme Court held that it is not necessary " 'for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of the working relationship is manifest before taking action.' " *INS*, 955 F.2d at 1007 (quoting *Connick*, 461 U.S. at 152, 103 S.Ct. at 1692).

There are no doubt some contexts in which the harm from the challenged speech is obvious. On this record, however, the Court cannot find that to be the case. Here, hospital managers gave virtually identical statements (in affidavits apparently drafted by their lawyers) that the purpose of the dress code policy is "to have an efficient staff... efficiently provide healthcare services... promote uniformity, foster discipline, encourage esprit de corps, [and] avoid divisiveness." (Def.'s Mot. Summ. J., App. at Exs. A, C, D, E, F, G, H, I, J, K, L, N, and O.) The Hospital's Director of Human Resources specifically asserted that the wearing of pro-union or anti-union pins would "create factionalism and interfere with discipline." (Def.'s Mot. Summ. J., App. at Ex. A.) Because these conclusory statements were made in affidavits, as opposed to in depositions or on the witness stand, there has been no opportunity to flesh them out or expose them to cross-examination. Further, there is contradictory evidence on the disruptive nature of the union pins. On November 9, 1999, roughly 30 Hospital employees wore "Union Yes" pins without apparent disruption. (Pl.'s Mot. Summ. J., App. at 50.) Furthermore, there is no evidence that Herrera's productivity suffered as a result

of his pin. In an evaluation of his job performance, Herrera received high marks for everything except his violation of the dress code policy. (Pl.'s Mot. Summ. J., App. at 133.) Herrera's supervisor wrote that "other than the failure to comply with the dress code request, [Herrera] is a positive asset to the department." (Pl.'s Mot. Summ. J., App. at 131.) To justify awarding Herrera only a 3% annual pay raise (as opposed to the usual 4%), the Hospital cited only Herrera's dress code violation but no other concerns with his productivity. (Pl.'s Mot. Summ. J., App. at 51.) The Court therefore finds that a trial in which Hospital personnel provide evidence in their own words of how union pins impact or threaten to impact the operations of the hospital is necessary before the *Pickering* balancing test can be properly performed.

Defendants place great reliance on *INS* and *Daniels* to assert that summary judgment is proper. It is true that in these cases the Fifth Circuit allowed the INS and the police department to satisfy their burden by asserting that uniform regulations are critical to obedience and commitment. *INS*, 955 F.2d at 1006; *Daniels*, 246 F.3d at 503. In so doing, the Fifth Circuit emphasized the military nature of the INS and the police, noting that "review of military regulations is much more deferential than... review of civil laws and regulations." *INS*, 955 F.2d at 1006 (citing *Goldman v. Weinberger*, 475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986)); *Daniels*, 246 F.3d at 503; *see also Kelley v. Johnson*, 425 U.S. 238, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976). Outside of the military context, of course, public employers are not entitled to the same high level of deference.

The Fifth Circuit has recognized that the existence of issues of material fact necessitates further evidentiary hearing before a court may conduct the requisite

analysis under *Pickering.* *McPherson,* 736 F.2d at 179–80. For the foregoing reasons, such an evidentiary hearing is required here.

### 4. Steps Three and Four

■ The third and fourth steps of the *Connick/Pickering* analysis are factual in nature. *Branton,* 272 F.3d at 739. The third step entails deciding whether Herrera's protected speech or association was a substantial or motivating factor in the adverse employment decision. *Id.; Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). It is clear that Herrera's speech was a substantial or motivating factor in the adverse employment decision. Herrera would not have been disciplined had he not worn the union pin.

The fourth step of the *Connick/Pickering* analysis is deciding whether the employer would have made the same employment decision in the absence of the protected speech or association. *Branton,* 272 F.3d at 739. The record is clear that the reason the Hospital disciplined Herrera was for wearing the "Union Yes" pin. Indeed his violation of the no-pin policy is the only blemish on his employment record. The Court rejects defendants' argument that Herrera was disciplined not for his pin but instead for insubordination for refusing to follow the instructions of superiors. Other courts have rejected similar arguments and have found that "refusing to obey an order that implicates an employee's First Amendment rights is not a sufficient reason for disciplining the employee." *Dunn v. Carroll,* 40 F.3d 287, 291 (8th Cir.1994); *Leonard v. City of Columbus,* 705 F.2d 1299, 1305 (11th Cir. 1983).

To summarize, the Court has found, first, as a matter of law, that plaintiff's speech is of public concern; second, that an evidentiary hearing is required before the Court can conduct the *Pickering* balance test; third, that plaintiff's speech was a substantial or motivating factor in the adverse employment action; and, fourth, that the employer would not have made the same employment decision in the absence of the protected speech or association.

### C. Liability & Immunities

### 1. Local Government Liability

■ Local government entities may be held liable under 42 U.S.C. § 1983 only for a deprivation of rights inflicted pursuant to an official policy or custom. *Board of the County Commissioners of Bryan County, Oklahoma v. Brown,* 520 U.S. 397, 403, 117 S.Ct. 1382, 1388, 137 L.Ed.2d 626 (1997); *City of St. Louis v. Praprotnik,* 485 U.S. 112, 123, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988); *Pembaur v. City of Cincinnati,* 475 U.S. 469, 479, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452. A local government entity may not be held liable for the random and unauthorized acts of employees. *Pembaur,* 475 U.S. at 477, 106 S.Ct. at 1297. Only those municipal officials who have "final policymaking authority" may by their actions subject a municipality to liability under § 1983. *Praprotnik,* 485 U.S. at 124, 108 S.Ct. at 924. State law governs the determination of whether a particular city official has final policymaking authority. *Id.*

■ Defendants argue that plaintiffs cannot point to a specific, official policy that has deprived plaintiffs of their constitutional rights. After a trial, the Court may ultimately find that the Hospital infringed upon plaintiffs' constitutional rights by enforcing the Hospital dress code and anti-adornment policy. The dress code and anti-adornment policy is clearly an official policy—it was imple-

mented by the Hospital's Administrator and Dress Code Committee and even given an official "policy number." (Def.'s Mot. Summ J., App. at Exs. A and A1.) Therefore, should plaintiffs ultimately prevail under the *Pickering* balance test, the Hospital would be liable for damages under 42 U.S.C. § 1983. Accordingly, the Hospital's motion is denied.

### 2. Qualified Immunity

 Defendants assert that each of the individuals named in the suit are entitled to qualified immunity.[7] Qualified immunity shields government officials from civil liability for damages based upon the performance of discretionary functions if the acts were objectively reasonable in light of then clearly established law. *Thompson v. Upshur County,* 245 F.3d 447, 456 (5th Cir.2001); *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Once a § 1983 defendant pleads qualified immunity and shows that he is a governmental official whose position involves the exercise of discretion, the plaintiff bears the burden of rebutting this defense by establishing that the official's wrongful conduct violated clearly established law. *Thompson,* 245 F.3d at 456–57, 460 (quoting *Pierce v. Smith,* 117 F.3d 866, 871 (5th Cir.1997)). "Clearly established" means that the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). A defendant's acts are objectively reasonable unless *all* reasonable officials in those circumstances would have then

known that the defendant's conduct violated the Constitution or federal statute as alleged by plaintiff. *Thompson,* 245 F.3d at 457. In this determination of objective reasonableness, the defendant's subjective state of mind is irrelevant. *Id.* Furthermore, even officials who reasonably, but mistakenly, commit a constitutional violation are entitled to immunity. *Glenn v. City of Tyler,* 242 F.3d 307, 312 (5th Cir. 2001).

 Here, the Court finds that the decision to discipline Herrera for violating an anti-adornment policy does not violate clearly established law. Plaintiffs fail to cite to any cases to the contrary. Meanwhile, each named defendant submitted an affidavit stating that he believed that the no-pin policy was constitutional because it did not target political or unpopular speech. (Def.'s Mot. Summ. J., App. at Exs. A–O.) It is reasonable to assume that the establishment and enforcement of an anti-adornment policy does not violate clearly established law.

### D. CWA Standing

 Defendants assert that CWA lacks standing. An association may sue based on injuries to itself or based on injuries to its members. *Texans United for a Safe Economy Education Fund v. Crown Central Petroleum Corporation,* 207 F.3d 789, 792 (5th Cir.2000); *Association of Community Organizations for Reform Now v. Fowler,* 178 F.3d 350, 356 (5th Cir.1999). Courts have long held that an association has standing to sue on its own behalf if it meets the same standing test that applies to individuals. *Associa-*

---

**7.** Plaintiffs do not state in the Complaint whether these individuals are named in their official or individual capacities, but indicate in their response to defendants' motion for summary judgment that they are being sued in their individual capacities. In suits brought against state officials in their individual capacity, the officer may raise in defense issues of absolute or qualified immunity. *Hafer v. Melo,* 502 U.S. 21, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991).

*tion of Community Organizations for Reform Now,* 178 F.3d at 356. For an individual to prove that they have standing, they must establish the existence of a "case" or "controversy" as required by Article III of the Constitution. *United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.,* 517 U.S. 544, 551, 116 S.Ct. 1529, 1533, 134 L.Ed.2d 758 (1996). This requires a plaintiff to demonstrate that (1) it has suffered an actual or threatened injury; (2) the injury is "fairly traceable" to the defendant's action; and (3) the injury will likely be redressed if the plaintiff prevails in the lawsuit. *Id.; Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Friends of the Earth, Inc. v. Crown Central Petroleum,* 95 F.3d 358, 360 (5th Cir.1996). An injury-in-fact is an "invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Public Citizen, Inc. v. Bomer,* 274 F.3d 212, 217 (5th Cir.2001)(citing *City of Los Angeles v. Lyons,* 461 U.S. 95, 101–02, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983))("The plaintiff must show that he has sustained or is in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical.").

 Here, CWA asserts an injury-in-fact. Plaintiffs assert that Herrera's suspension had a negative impact on CWA's ability to accomplish its goals. (Pl.'s Complaint at 7.) Clay Everett, President of CWA Local 6127, asserted that prior to Herrera's suspension, 25 or more Hospital employees would attend union meetings. After the suspension, attendance at meetings "immediately dropped off" to only about 10 or 12 employees. (Pl.'s Mot. for Summ. J., App. at 53.) This injury is concrete and particularized; it is not hypothetical. The Court is also persuaded that the injury is traceable to defendants' actions. Finally, the injunction requested is capable of redressing the injury. Therefore, plaintiff CWA has standing to sue on its own behalf.

 An association has standing to sue on behalf of its members when (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members. *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977); *Texans United for a Safe Economy Education Fund,* 207 F.3d at 792; *Friends of the Earth, Inc. v. Crown Central Petroleum,* 95 F.3d 358, 360 (5th Cir. 1996). Plaintiffs allege that defendants' decision to discipline Herrera "was intended to and did have a chilling effect" upon the protected speech of CWA members. (Pl.'s Complaint at 8.) Plaintiffs, however, present not a single affidavit supporting this contention. Mere allegations of a chilling effect, without more, are insufficient to establish standing. *Meese v. Keene,* 481 U.S. 465, 473, 107 S.Ct. 1862, 1867, 95 L.Ed.2d 415 (1987); *Laird v. Tatum,* 408 U.S. 1, 13–14, 92 S.Ct. 2318, 2325–26, 33 L.Ed.2d 154 (1972). Therefore, CWA does not have standing to sue in a representative capacity because the record does not indicate that any other CWA member would have standing to sue in its own right. As previously discussed, however, CWA does have standing to sue on its own behalf.

### III. Conclusion

For the foregoing reasons, plaintiffs' and defendants' cross-motions for summary

judgment are DENIED. Furthermore, (1) defendants' motion for summary judgment on the issue of whether plaintiffs were deprived of their constitutional rights by an official policy is DENIED; (2) defendants' motion for summary judgment on the issue of qualified immunity for each of the individual defendants named in plaintiffs' complaint is GRANTED; and (3) defendants' motion for summary judgment on the issue of plaintiff CWA's standing is DENIED.